UNITED DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| TONY BISHOP, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 4:05CV00623 CAS (AGF) |
| | ) |
| JO ANNE B. BARNHART, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before this Court for judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Tony Bishop's application for Supplemental Security Income based upon a disability, under Title XVI of the Social Security Act (SSA), 42 U.S.C. §§ 1381-1383f. The action was referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b) for recommended disposition. For the reasons set forth below, the Court recommends that the decision of the Commissioner be affirmed.

Plaintiff, who was born on November 13, 1983, filed the present application for benefits on February 12, 2003, claiming that he was unable to work due to being a slow learner, being unable to read, and having bad nerves. After his application was denied at the initial administrative level, Plaintiff requested a hearing before an Administrative Law Judge (ALJ). A hearing was held on December 7, 2004, at which Plaintiff and a

vocational expert (VE) testified. On January 11, 2005, the ALJ issued a decision that Plaintiff was not disabled as defined by the SSA. The Appeals Council of the Social Security Administration denied Plaintiff's request for review on February 23, 2005; on March 22, 2005, the Appeals Council denied Plaintiff's request to reopen its decision. Plaintiff has thus exhausted all administrative remedies, and the ALJ's decision stands as the final agency action.

Plaintiff argues that the ALJ did not properly assess Plaintiff's mental residual functional capacity (RFC), resulting in a decision that was not based upon substantial evidence on the record as a whole.

## BACKGROUND

**Application Forms and Agency Notes**

The Social Security representative who interviewed Plaintiff on February 12, 2003, when he filed his application for benefits, made the following written observation: "Plaintiff in . . . with his mother . . . who tried to help him in answering questions/they both were very slow and difficult to understand. Claimant talked very low, at times he didn't seem to understand the questions. He mostly sat with his head down and occationally [sic] looked around." Tr. at 191.

Plaintiff's current medications were listed as Ranitidine, 150 mg a day for stomach problems; Paroxetine (Paxil), 20 mg a day for nerves; and Flonase, 50 mg a day for breathing. Tr. at 74. Two of the forms connected to Plaintiff's application were apparently filled out by Plaintiff himself. One is the four-page "Claimant Questionnaire"

dated February 29, 2003, and the other is the single-page "Claimant's Recent Medical Treatment" completed on January 23, 2004, in connection with the request for a hearing before an ALJ. The writing appears juvenile and contains numerous grammatical and spelling errors. Tr. at 185-88, 107. On other pages of the form requesting a hearing, Plaintiff states that he could not go out if no one were with him, and that he did not have a card, presumably a Medicare card, to get medications.

An agency memo dated September 21, 2004, documenting a phone call to Plaintiff to tell him that he needed to appear at his hearing, noted that Plaintiff was very soft-spoken and hard to hear, and that he explained that he was trying to find a lawyer and that he could not get around by himself on busses. Tr. at 38. The hearing, which was to take place on June 22, 2004, was postponed to give Plaintiff time to obtain legal representation. Tr. at 234-38.

**School and Medical Records**

The first documentation in the record of Plaintiff's impairments is a reevaluation of Plaintiff's situation in school, prepared by the Special School District (SSD) of St. Louis County, Missouri, in mid-February 1995. The report noted that Plaintiff had been diagnosed as learning disabled, that he was spending 26.75 hours per week in special education, and that he was not meeting the goals of his Individual Education Program (IEP), which included reading, math, and language. It was noted that on May 13, 1992, Plaintiff had scored a full-scale IQ of 85 on the Wechsler Intelligence Scale for Children - Revised (WISC-R). His current composite IQ on the Kaufman Brief Intelligence test (K-

3

Bit) was 83, which placed him in the low average range, but his academic performance, as measured by the Woodcock-Johnson Tests of Achievement - Revised conducted on February 13, 1995 (.3 percentile in reading, 3rd percentile in math, .1 percentile in written language, and .4 percentile in skills), was noted as lower than expected, especially in basic reading and written expression.  This was attributed as possibly due to problems in processing information, such as difficulty with sound/symbol recognition.  Tr. at 93-106.

The record also contains an IEP reevaluation prepared by SSD for Plaintiff on December 11, 1998.  Plaintiff was then in high school in self-contained special education classes, with the exception of physical education and home economics, for which he was integrated with the general student body.  The report noted that Plaintiff had missed a substantial amount of school, and that teacher observation and previous tests indicated that this affected his learning.  It was also reported that Plaintiff was showing progress due to increased attendance as of November 12, 1998, with passing grades in math and pre-vocational classes, and that he was involved in a "community access program," which included instruction in the work place and a functional curriculum in the classroom.  However, areas of concern included all areas of reading, number recognition, multi-step math word problems and applications to real life, oral expression and comprehension, and attendance.  None of Plaintiff's previous IEP goals in these areas had been met.  Tr. at

75-92. Plaintiff's high school report card for 1998-1999 showed "F"s in all classes. Tr. at 156.[1]

Progress notes from Pine Lawn Center dated February 21, 2003, state that Plaintiff was referred to a hospital emergency room for gastritis. Tr. at 232.

On April 14, 2003, James D. Reid, Ph.D., conducted a consultative psychological examination of Plaintiff in connection with his application for SSI benefits. Dr. Reid described Plaintiff's facial expression and manner as anxious. He assessed Plaintiff's cooperation as poor, and stated that he was not convinced that Plaintiff's "presentation was genuine." Results of a test designed to reveal suspect effort indicated that Plaintiff's effort was suspect. Dr. Reid observed that Plaintiff spoke with an articulation disorder or mumbling, and that he spoke low, resulting in Dr. Reid having "a little trouble" understanding what Plaintiff was saying. Tr. at 226.

Plaintiff reported that his body would get shaky and he would get too excited to function, and that he avoided all types of situations. Indeed, Dr. Reid observed that Plaintiff had sweat on his upper lip, and that his hands shook significantly when he wrote his name and did portions of certain tests, but Dr. Reid again opined that he was not convinced this presentation was genuine. Dr. Reid stated that Plaintiff was alert and oriented as to person, place, time, and day, although attention and mental control were "inadequate." On an intelligence test, Plaintiff's scored a verbal IQ of 54, performance

---

[1] The record also contains copies of report cards for another Tony Bishop. Tr. at 145.

IQ of 53, and full-scale IQ of 49, placing Plaintiff in the range of moderate mental retardation. Dr. Reid stated, however, that he did not believe that these scores were valid. Dr. Reid wrote that Plaintiff told him that he stayed in his house and played video games, and that he needed help shopping because he could not figure out the price of things. Dr. Reid diagnosed Plaintiff with a generalized anxiety disorder "at most," and possibly an avoidant personality disorder, assigned a current Global Assessment of Functioning (GAF) score of 75,[2] and commented, "probable malingering." Tr. at 227-28.

Dr. Reid also documented his clinical impressions of the effect of Plaintiff's impairments on work-related activity as follows: ability to relate to others, including fellow workers and supervisors; social interaction; and ability to understand, remember, and follow instruction were all slightly impaired. Ability to maintain attention required to perform simple repetitive tasks, ability to withstand the stressors and pressures associated with day-to-day work activity, and adaptation skills were all within normal limits. Dr. Reid added that Plaintiff appeared to be "at risk" to manage his own funds. Tr. at 229.

The record includes treatment notes from North Central Community Health Center from August 4 through November 17, 2004. On numerous occasions during this time frame, Plaintiff went to the clinic for help in filling out various forms. On August 4,

---

[2] A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32. GAF scores of 41 to 50 reflect "serious" difficulties in social, occupational, or school functioning; scores of 51-60 indicate "moderate" difficulties in these areas; scores of 61-70 indicate "mild" difficulties.

6

2004, Plaintiff went to the clinic complaining of low back pain of two months duration; abdominal pain; and "bad nerves" and shaking of the body, a condition he reported having since childhood which had never been treated. A history of depression was noted, and Plaintiff was diagnosed with "anxiety state, unspecified" and referred for social services. Tr. at 222-23.

On September 8, 2004, Plaintiff complained of abdominal pains that had followed a consistent pattern for one year, especially after ingestion of milk. Plaintiff was treated for acute gastritis, diagnosed with lactose intolerance, and referred to a nutritionist. The examining doctor noted that Plaintiff did not make eye contact, and that the possibility should be considered that some of Plaintiff's distress may be related to psychiatric/cognitive dysfunction. Tr. at 219-20. On October 8, 2004, Paxil (20 mg daily) was prescribed after Plaintiff stated that he thought he needed medication for depression, that he had been nervous all his life, and that he had seen an advertisement for Zoloft on TV. Plaintiff was diagnosed with depressive disorder, not elsewhere classified. A physical examination showed normal findings. Tr. at 212-13.

On November 17, 2004, Plaintiff went to the clinic with complaints of chest pain and shortness of breath. An examination indicated normal breath and normal heart sounds. Flonase (two puffs in each nostril daily) was prescribed for allergic rhinitis. It was noted that Plaintiff's depression appeared better that day, and he was encouraged to continue taking Paxil. Tr. 205-07.

7

**Evidentiary Hearing**

Plaintiff, who was represented by counsel at the evidentiary hearing held on December 7, 2004, testified that he was 21 years old, that he lived in a house with his grandparents and mother, and that he completed eighth grade and part of ninth grade, attending special education classes almost all day. Several times during the hearing, the ALJ asked Plaintiff to speak louder. Plaintiff testified that he had never worked, due to problems with his stomach, chest, lower back, nerves, and memory. He described daily stomach cramps of two years' duration, which occurred primarily after he ate and which were relieved by medication; shortness of breath, which occurred two or three times a week when his "nerves really bother" him; low back pain for the past two months brought on by doing exercises he thought would relieve his stomach discomfort. Tr. at 243-46.

The ALJ then asked Plaintiff about his problems with his "nerves." Plaintiff testified that he got "shaky" almost every day. He stated that an episode would last about two hours, that he would lie down and take his medication if he had any, and that he had had this problem since he was little. With regard to his memory problems, Plaintiff testified that he had trouble with reading, spelling, writing, and math. He stated that he could add and subtract, but could not do division, multiplication, and fractions. When asked if he could make change, he responded "How much," and he responded "Yeah," when asked if he knew the value of the various coins. Tr. at 247-49.

Plaintiff also testified that he believed he was depressed. He stated that when his cousin would tease him about his language problems, he would sometimes go to his room and cry. Plaintiff testified that he did not have a driver's license, having failed the written part of the test. He stated that he could walk about six blocks, stand in one place for about one hour, and sit for two to three hours at a time. He stated that he did some household chores, played video games, watched TV, and visited friends or relatives about every two months. Plaintiff testified that he had applied for two jobs the previous fall, one at a thrift shop and one at a fast food restaurant, and had not received an offer for either. He stated that he could not fill out the application correctly for the latter job. Tr. at 249-54.

The ALJ asked a VE whether there would be jobs for an individual with Plaintiff's vocational factors and the following RFC: able to lift 20 pounds occasionally, 10 pounds frequently, stand and/or walk for up to a total of six hours in an eight-hour workday, sit for a total of six hours in an eight-hour workday, and engage in only occasional or less contact with the public; further assuming that such individual would be limited to jobs involving understanding, remembering, and following simple instructions and directions, to jobs requiring less than occasional use of mathematics, and to jobs requiring no driving. The VE responded that such an individual could be a packager, inspector, and assembler, all of which were light unskilled jobs, and all of which existed in significant numbers in Missouri and nationally. Tr. at 256. Plaintiff's counsel then asked the VE whether someone whose reading was at the .3 percentile, math in the 3rd percentile,

9

written language at the .4 percentile, and broad knowledge of skills at the .4 percentile would be able to work at the jobs the VE had cited. The VE responded that such a person would have difficulty sustaining work. Tr. at 257.

**ALJ's Decision**

The ALJ found that Plaintiff had a learning disorder in reading, written expression, and math; and generalized anxiety disorder, and that these impairments in combination were severe. He found, however, that they did not meet or medically equal the requirements for any of the deemed-disabling impairments listed in the Commissioner's regulations. The ALJ proceeded to assess Plaintiff's RFC, noting that in doing so, he carefully considered all the relevant factors as set forth in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ first noted inconsistencies between Plaintiff's testimony and the record with regard to chest, lower back, and stomach problems, and found that Plaintiff did not have a severe impairment involving any of these physical matters, adding that Plaintiff did not claim on his application for disability benefits that he had any physical impairment. Tr. at 17-19.

The ALJ also found unpersuasive Plaintiff's allegations that his mental problems precluded all work. The ALJ concluded that Plaintiff appeared to have elementary math skills that would allow him to function in the workplace, stating that Plaintiff testified at the hearing that he could make change. The ALJ also concluded that the evidence did not suggest that Plaintiff was illiterate. The ALJ pointed to the Daily Activities Questionnaire which Plaintiff appeared to have completed himself. The ALJ believed

that this form showed that although Plaintiff frequently used incorrect grammar, he generally comprehended questions that were asked.  The ALJ further believed that Plaintiff's IQ scores indicated that he should have no difficulty understanding, remembering, and carrying out at least simple work instructions.  Tr. at 19.

The ALJ next addressed Plaintiff's claim that he had "bad nerves."  The ALJ noted that Plaintiff had not received any ongoing treatment from a mental health specialist, nor had he ever been hospitalized for anxiety-related symptoms.  The ALJ noted that Plaintiff had been prescribed a low dosage of Paxil, adding that the fact that the dose had not changed suggested that it provided relief from any symptoms Plaintiff "may experience."  The ALJ pointed to Dr. Reid's assessment of a GAF score of 75, which was indicative of no more than slight symptoms.  Tr. at 19.

Plaintiff's failure to have ever worked was seen by the ALJ as a factor which might have motivated Plaintiff consciously or unconsciously to have exaggerated his symptoms so that he could obtain regular monthly income.  Furthermore, the ALJ commented that Plaintiff's earnings record did not support the proposition that but for his alleged impairments he would be working.  In sum, the ALJ found that Plaintiff's allegations of symptoms precluding all substantial gainful activity were not credible.  Tr. at 19.

The ALJ concluded that Plaintiff had the exertional RFC to perform work that involved lifting/carrying up to 50 pounds, with no frequent lifting/carrying of over 25 pounds; and unlimited standing, walking, or sitting.  The ALJ noted that this coincided

with the requirements for "medium" work, as defined in the Commissioner's regulation. The ALJ further concluded that Plaintiff had the mental RFC to understand, remember, and carry out repetitive, simple work instructions; but that he could not engage in work requiring driving skills, and more than minimal use of math, reading, or writing, or more than occasional contact with the general public. The ALJ noted that, based upon Plaintiff's vocational factors (age, education, and work experience), the Medical-Vocational Guidelines found at 20 C.F.R. 416.969, Appendix 2, Rule 203.25, would direct a finding of not disabled. Tr. at 19-20. Recognizing that in light of Plaintiff's mental limitations, the Guidelines were not dispositive, the ALJ relied upon the testimony of the VE that there were jobs, existing in significant numbers regionally and nationally, which someone with Plaintiff's physical and mental RFC could perform. Tr. at 19-21.

## DISCUSSION

**Standard of Review and Statutory Framework**

In reviewing the denial of disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoted case omitted). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision . . . the court must "also take into account whatever in the record fairly detracts from that decision."

Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)).  Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'"  Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir.1995)).

In order to qualify for Social Security disability benefits, a Plaintiff must demonstrate an inability to engage in any substantial gainful activity by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months.  42 U.S.C. § 423(d)(1)(A); Barnhart v. Walton, 535 U.S. 212, 217-22 (2002) (both the impairment and the inability to engage in substantial gainful employment must last or be expected to last not less than 12 months).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process.  First, the Commissioner decides whether the claimant is engaged in substantial gainful activity.  If so, disability benefits are denied.  If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, defined in 20 C.F.R. § 404.1520(c) as an impairment which significantly limits an individual's physical or mental ability to do basic work activities.

If the claimant's impairment is not severe, disability benefits are denied.  If the impairment is severe, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in Appendix 1 (20 C.F.R., Pt. 404, Subpt. P).  If the claimant's impairment is equivalent to one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is

13

one that does not meet or equal a listed impairment, the Commissioner asks at step four whether the claimant has the RFC to perform his or her past relevant work.

If the claimant is able to perform his or her past relevant work, he or she is not disabled. If the claimant cannot perform his or her past relevant work, step five asks whether the claimant has the RFC to perform work in the national economy in view of his or her age, education, and work experience (vocational factors). If not, the claimant is declared disabled and is entitled to disability benefits. 20 C.F.R. §§ 404.1520(a)-(f); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003).

The claimant bears the initial burden at step four to show that he or she is unable to perform his or her past relevant work. Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). If met, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors. Id. Where a claimant cannot perform the full range of work in a particular category of work listed in the regulations (very heavy, heavy, medium, light, and sedentary), due to a nonexertional impairment such as pain or depression, the ALJ must consider testimony of a VE to meet her burden. Id.; Wilcutts v. Apfel, 143 F.3d 1134, 1137 (8th Cir. 1998).

The response of a VE to a hypothetical question that includes all of a claimant's impairments properly accepted as true by the ALJ constitutes substantial evidence to support a conclusion of no disability at step five. Hunt v. Massanari, 250 F.3d 622, 625

(8th Cir. 2001) (the hypothetical "must capture the concrete consequences of the claimant's deficiencies"). Here the ALJ decided at step five that, based upon the VE's testimony, there were jobs in the economy that Plaintiff could perform.

**ALJ's Determination of Plaintiff's Mental RFC**

Plaintiff argues that ALJ's determination of mental RFC is not supported by medical evidence, and that the ALJ's decision failed to articulate a legally sufficient rationale for the extent to which he believed Plaintiff's learning disabilities affected Plaintiff's functioning. Plaintiff specifically points to the results of the 1995 academic achievement tests and the evidence in the record that "on numerous times" Plaintiff needed assistance in completing forms. Plaintiff contends that as a result, the hypothetical question posed to the VE was flawed, and that the VE's answer did not constitute substantial evidence upon which to base a decision that Plaintiff was not disabled.

A disability claimant's RFC is the most he can still do despite his limitations. 20 C.F.R. § 404.1545(a)(1). In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Id. at 1147. The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his

limitations.'" Krogmeier v. Barnhart, 294 F.3rd 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

In order to constitute substantial evidence upon which to base a denial of benefits, the testimony of a VE must be in response to a hypothetical question which "captures the concrete consequences of the claimant's deficiencies." Hunt, 250 F.3d at 625; Taylor v. Chater, 118 F.3d 1274, 1278 (8th Cir. 1997). The question, however, need not include alleged limitations which the ALJ properly discredits. Randolph v. Barnhart, 386 F.3d 835, 841 (8th Cir. 2004).

Here, as noted above, the ALJ included in the hypothetical question posed to the VE the restriction to work involving no more than minimal use of math, reading, or writing. Evidence in the record supports the conclusion that at the time of Plaintiff's application for disability benefits and the ALJ's decision, Plaintiff was capable of minimal math, reading, and writing. Plaintiff received a WISC-R full-scale IQ score of 85 in 1992, and K-BIT composite IQ score of 82 in 1995. Plaintiff's lower IQ scores in 2003 were considered by the consulting examiner to be suspect and due to a lack of effort.

The forms filled out by Plaintiff exhibit minimal reading and writing skills, and Plaintiff testified that he could do simple addition. Plaintiff also indicated that he spent his time playing video games, and his testimony at the hearing indicated basic oral comprehension and expression as well. The Court does not believe that the results of achievement tests from 1995 in these areas had to be adopted by the ALJ and included in

the hypothetical posed to the VE, especially where, as here, the school records suggest that Plaintiff's achievement was negatively impacted by his high rate of absenteeism and tardiness.

The Court notes that despite references in the record to Plaintiff not being able to go anywhere on his own, he did apply for at least two jobs in the fall of 2002, suggesting that he did not believe that an inability to go places on his own precluded him from working. The record may support a result contrary to the ALJ's. However, in sum, the Court concludes that substantial evidence supports the ALJ's assessment of Plaintiff's mental RFC and that, thus, the hypothetical question the ALJ posed to the VE was proper.

## CONCLUSION

The record, including the VE's answer to the hypothetical question posed by the ALJ, constituted substantial evidence in support of the Commissioner's decision that Plaintiff was not disabled, as that term is defined by the Social Security Act.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.

The parties are advised they have eleven (11) days to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.

_____
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 10th day of April, 2006.